IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____

JOSE ROLANDO MOSHAN-MARTINEZ, et al.,   )
    )
    Plaintiffs    )
v.    )    CASE NO: 5:20-cv-00205-FL
    )
FRANCISCO VALADEZ, JR. LLC et al.    )
    )    FIRST AMENDED COMPLAINT
    Defendants.    )
_____    )

PRELIMINARY STATEMENT

1. This is an action by nine (9) foreign migrant agricultural workers who lawfully entered the United States pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program") to perform labor harvesting various crops in North Carolina for Defendants during the 2018 agricultural season.

2. Plaintiffs bring this action to assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the North Carolina Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1, *et seq.* ("NCWHA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.* ("TVPRA"), the Unfair and Deceptive Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("UDTPA"), and North Carolina common law.

3. With no fixed-site agricultural operation of their own, prior to the 2018 season, the farm labor contractor defendants procured massive contracts relative to their size and experience to furnish labor to various North Carolina farms seeking the benefits of an H-2A workforce to harvest their crops without the costs of direct H-2A program participation.

1

4. The labor contractors then targeted foreign farmworkers in various states in Mexico who they could convince to pay large recruitment fees for the opportunity to work lawfully in the U.S., using false promises about the wages and working conditions that would be provided.

5. The defendant labor contractors' fraudulent recruitment scheme left Plaintiffs in crippling debt resulting from the unlawfully charged recruitment fees and for expenses those Defendants required Plaintiffs to pay to travel to work for them on North Carolina blueberry farms.

6. When Plaintiffs left their hometowns in Mexico to travel hundreds of miles to North Carolina, the defendant labor contractors then exploited Plaintiffs' indebtedness, housed them in substandard conditions, and cultivated a climate of fear to compel Plaintiffs' labor against their will at various blueberry farms.

7. Plaintiffs now bring claims against the labor contractors and the farming operations for unpaid wages, including minimum wages as required by the FLSA, promised wages under the NCWHA, and breach of their employment contracts. Plaintiffs seek to bring a collective action pursuant to Section 216(b) of the FLSA. Plaintiffs further bring anti-trafficking claims under the TVPRA against their labor contractors for using threats and exploiting their indebted state to compel Plaintiffs' labor as well as against those that knowingly financially benefitted from this scheme.

8. Plaintiffs also bring this action against their labor contractors to remedy the contractors' unfair and deceptive practices that injured Plaintiffs, pursuant to the UDTPA, and for fraud and misrepresentation.

9. Plaintiffs seek damages, declaratory relief and injunctive relief, pre- and post-judgment interest, costs of the action, attorneys' fees, and other appropriate relief to make themselves whole for damages suffered due to the Defendants' violations of law.

10. This Court has jurisdiction over this matter pursuant to:

    a. 28 U.S.C. § 1331 (Federal Question);

    b. 28 U.S.C. § 1337 (Interstate Commerce);

    c. 29 U.S.C. § 216(b) (FLSA);

    d. 18 U.S.C. § 1595(a) (TVPRA); and

    e. 28 U.S.C. § 1367 (Supplemental Jurisdiction).

11. This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiffs' FLSA and TVPRA claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

12. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because, at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in Johnston, Bladen, and Duplin Counties, and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims were committed within the jurisdiction of the Eastern District of North Carolina.

## PARTIES

### NAMED PLAINTIFFS

14. Plaintiffs Jose Rolando Moshan-Martinez, Jose Eduardo Casillas-Serrano, Bulmaro de la Rosa-Alvarado, Isaias Gomez-Gonzalez, Efrain Gomez-Santiz, Jose Luis Hernandez-Martinez, Maricela Jimenez-Giron, Oscar Guadalupe Lopez-Arcos, and Lorenzo Lopez-Lopez are citizens

of Mexico who were admitted to the U.S. on a temporary basis with visas pursuant to the H-2A Program, to perform agricultural labor beginning in May 2018.

15. In 2018, Defendants recruited and employed Plaintiffs for in agricultural and related work in or around Duplin and Bladen Counties, North Carolina.

16. Throughout the entirety of that employment in 2018, Defendants employed Plaintiffs to perform agricultural and related work for Defendants in or around Duplin and Bladen Counties, North Carolina, within the meaning of 29 U.S.C. §§ 203(d) and 203(g), N.C. Gen. Stat. §§ 95-25.2(3) and 95-25.2(5), , and 20 C.F.R. §§ 655.103(b) and 655.1300(c), and jointly employed them within the meaning of 29 C.F.R. § 791.2.

17. At all times relevant to this Complaint, Plaintiffs were engaged in commerce or in the production of goods for commerce, or were employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

<u>DEFENDANTS</u>

18. Defendant Sleepy Creek Farms, Inc. (hereinafter "Sleepy Creek Farms") is a corporation organized under the laws of the state of North Carolina in 1967. James L. Maxwell III, 938 Millers Chapel Road, Goldsboro, North Carolina 27534, is its registered agent for service of process.

19. At all times relevant to this Complaint, Defendant Sleepy Creek Farms was a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

20. At all times relevant to this Complaint, Defendant Sleepy Creek Farms was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

4

21. Defendant Sleepy Creek Farms is affiliated with Defendant Goldsboro Milling Company of Goldsboro, North Carolina (hereinafter "Goldsboro Milling").

22. Defendant Goldsboro Milling is a corporation organized under the laws of the state of North Carolina in 1916. H.G. Maxwell, Lakeshore Drive, Goldsboro, North Carolina 27534, is its registered agent for service of process.

23. At all times relevant to this Complaint, Defendant Goldsboro Milling was a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

24. At all times relevant to this Complaint, Defendant Goldsboro Milling was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

25. At all times relevant to this Complaint, multiple individuals serving as the corporate officers of Defendant Sleepy Creek Farms were simultaneously corporate officers of Defendant Goldsboro Milling.

26. At all times relevant to this Complaint, James L. Maxwell III (hereinafter "Maxwell") has been President of Defendant Sleepy Creek Farms and Secretary of Defendant Goldsboro Milling.

27. At all times relevant to this Complaint, J. Walter Pelletier III (hereinafter "Pelletier") has been Secretary and Treasurer of Defendant Sleepy Creek Farms and President of Defendant Goldsboro Milling.

28. At all times relevant to this Complaint, Defendants Sleepy Creek Farms and Goldsboro Milling (collectively the "Sleepy Creek Defendants"), operated Sleepy Creek Farms, a blueberry farm that cultivates and harvests approximately 700 acres of blueberries in or near Harrells, North Carolina.

29. Sleepy Creek Farms' blueberries are packaged and sold under various labels including the Sleepy Creek Farms and Driscoll labels to stores such as Trader Joe's, Harris Teeter, and Food Lion.

30. At all times relevant to this Complaint, Yusef Ewais served as the Human Resources Director of Defendant Goldsboro Milling and the Director of Business Development of both Defendants Goldsboro Milling and Sleepy Creek Farms.

31. At all times relevant to this Complaint, Goldsboro Milling employees, including Yusef Ewais and Kevin Ascanio, were authorized to make and did make decisions regarding human resources and farm labor at Defendant Sleepy Creek Farm's agricultural operation.

32. At all times relevant to this Complaint, upon information and belief, the Sleepy Creek Defendants have possessed and/or exercised the power and authority to direct, control, and/or supervise the work performed by Plaintiffs and similarly situated employees for Defendants on their farm.

33. Defendant Winzeler Farms, LLC (hereinafter "Winzeler Farms") is a corporation organized under the laws of the state of North Carolina in 2007. Dennis Winzeler, 920 Center Street, Bryan, Ohio, 43506, is its registered agent for service of process.

34. At all times relevant to this Complaint, Defendant Winzeler Farms was and is a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

35. At all times relevant to this Complaint, Defendant Winzeler Farms was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5)..

36. At all times relevant to this Complaint, Defendant Winzeler Farms operated a blueberry farm in or near Kelly, North Carolina.

6

37. At all times relevant to this Complaint, upon information and belief, Defendant Winzeler Farms possessed and/or exercised the power and authority to direct, control, and/or supervise the work performed by Plaintiffs and similarly situated employees for Defendant on their farm.

38. Defendant Cottle Farms, Inc. (hereinafter "Cottle Farms") is a corporation organized under the laws of the state of North Carolina in 1991. Ned Cottle, 1217 Cape Coral Parkway, Cape Coral, Florida, 33904, is its registered agent for service of process.

39. At all times relevant to this Complaint, Defendant Cottle Farms was and is a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

40. At all times relevant to this Complaint, Defendant Cottle Farms was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

41. At all times relevant to this Complaint, Defendant Cottle Farms operated a farm that grows various vegetables and fruit, including blueberries in or near Faison, North Carolina.

42. Cottle Farms' blueberries are packaged and sold under various labels, including Cottle Farms and Cottle Organics, to supermarkets including Food Lion and Harris Teeter.

43. At all times relevant to this Complaint, upon information and belief, Defendant Cottle Farms possessed and/or exercised the power and authority to direct, control, and/or supervise the work performed by Plaintiffs and similarly situated employees for Defendant on their farm.

44. Defendant Francisco Valadez, Jr., LLC, (hereinafter "Valadez LLC") is a corporation organized under the laws of the state of North Carolina in 2015. Luther D. Starling, Jr., 405 E. Market Street, Smithfield, North Carolina 27577, is its registered agent for service of process.

7

45. In 2018, Defendant Valadez LLC was registered with the U.S. Department of Labor ("USDOL") as a farm labor contractor and listed its address as 1345 Preston Road in Smithfield, North Carolina in Johnston County.

46. At all times relevant to this Complaint, Defendant Valadez LLC operated as a Farm Labor Contractor as defined by 29 U.S.C. § 1802(7) in that, for money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished or employed migrant agricultural workers.

47. At all times relevant to this Complaint, Defendant Valadez LLC was and is a corporation "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

48. At all times relevant to this Complaint, Defendant Valadez LLC was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), and the FLSA, 29 U.S.C. § 203.

49. Defendant Francisco Valadez, Jr., (hereinafter "Valadez Jr.") is registered with the USDOL as a Farm Labor Contractor.

50. At all times relevant to this Complaint, Defendant Valadez Jr. operated as a Farm Labor Contractor as defined by 29 U.S.C. § 1802(7) in that, for money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished or employed migrant agricultural workers.

51. Defendant Valadez Jr.'s most current Farm Labor Contractor registration became valid on November 5, 2019 and it expires on November 4, 2020. That registration lists his residence as 1803 Progressive Church Road in Princeton, North Carolina in Johnston County.

52. Upon information and belief, in 2018, Defendant Valadez, Jr. resides at 1345 Preston Road in Smithfield, North Carolina in Johnston County.

53. At all times relevant to this Complaint, Defendant Valadez, Jr. employed Plaintiffs within the meaning of the FLSA, 29 U.S.C. § 203(d) and N.C. Gen. Stat. § 95-25.2(4), and he was an employer within the meaning of 20 C.F.R. § 655.103(b).

54. At all times relevant to this Complaint, Defendant Valadez, Jr. was and is an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

55. At all times relevant this Complaint, Defendants were joint and individual employers of the Plaintiffs within the meaning of 29 U.S.C. §§ 203(d) and (g), N.C. Gen. Stat. §§ 95-25.2(3), and 20 C.F.R. §§ 655.103(b), 655.1300(c), and 29 C.F.R. § 791.2.

## STATEMENT OF FACTS

## SLEEPY CREEK FARMS' H-2A PROGRAM HISTORY

56. Defendant Sleepy Creek Farms consistently participated in the H-2A program each year from 2013 to 2018, either by directly petitioning for foreign labor to work at Sleepy Creek Farms or by furnishing fixed-site operation work contracts to an H-2A Labor Contractor, enabling them to petition for foreign labor to furnish to Sleepy Creek Farms.

57. For the consecutive years 2013, 2014, 2015, 2016, 2017, and 2018, Defendant Sleepy Creek Farms, or the H-2A Labor Contractor that Sleepy Creek Farms contracted with to furnish H-2A labor, utilized the services of attorney Andrew Jackson of Andrew Jackson Law of Clinton, North Carolina ("Andrew Jackson"), as its agent to prepare and file their H-2A applications with the required federal and state agencies.

58. In 2017, Defendant Sleepy Creek Farms submitted an Application for Temporary Employment Certification, Form ETA-9142A ("2017 Blueberry Application"), seeking permission to bring in and directly employ four hundred (400) H-2A workers from May 1, 2017 to July 23, 2018.

59. USDOL approved the 2017 Blueberry Application which included the 2017 Blueberry Clearance Order, a required part of an H-2A application containing the details of the job offer.

60. In the 2017 Blueberry Application and accompanying Clearance Order, as is required of all employers seeking USDOL approval to participate in the H-2A program, H.R. Director Yusef Ewais certified on behalf of Defendant Sleepy Creek Farms their compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135.

61. Upon information and belief, in preparation for the 2017 harvesting season, Goldsboro Milling and/or Sleepy Creek Farms personnel, including Yusef Ewais, traveled to Mexico to recruit and assist potential workers with the consular visa process.

62. In 2017, Goldsboro Milling and/or Sleepy Creek Farms personnel performed directly, or arranged for the performance of, employer activities necessary to seek U.S. government approval for, recruit, hire, inform, transport, train, supervise, house, and issue pay to, their H-2A workforce.

COTTLE FARMS H-2A PROGRAM HISTORY

63. Defendant Cottle Farms consistently participated in the H-2A program each year from 2014 to 2018, either by directly petitioning for foreign labor to work at Cottle Farms or by furnishing fixed-site operation work contracts to an H-2A Labor Contractor enabling the contractor to petition for foreign labor to furnish to Cottle Farms.

64. For the consecutive years 2014, 2015, 2016, 2017, and 2018, Defendant Cottle Farms or the H-2A Labor Contractor that Cottle Farms contracted with to furnish H-2A labor, utilized the

services of Andrew Jackson as its agent to prepare and file their H-2A applications with the required federal and state agencies.

65. In 2017, Defendant Cottle Farms submitted an Application for Temporary Employment Certification, Form ETA-9142A ("2017 Cottle Farms Application") seeking permission to bring in and directly employ one hundred thirty (130) H-2A workers from March 31, 2017 to October 26, 2017.

66. USDOL approved the 2017 Cottle Farms Application which included the 2017 Cottle Farms Clearance Order.

67. In the 2017 Cottle Farms Application and accompanying Clearance Order, on behalf of Defendant Cottle Farms, Manager Ron E. Cottle certified their compliance with the assurances contained in at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

68. In 2017, Defendant Cottle Farms personnel performed directly, or arranged for the performance of, employer activities necessary to seek U.S. government approval for, recruit, hire, inform, transport, train, supervise, house, and issue pay to, their H-2A workforce associated with their 2017 Cottle Farms Clearance Order.

69. Also in 2017, in addition to directly petitioning for an H-2A workforce, Defendant Cottle Farms utilized the services of Defendant Valadez Jr. by providing him a fixed-site agricultural operation work contract to furnish up to 99 additional H-2A workers to Cottle Farms.

<u>THE VALADEZ DEFENDANTS' H-2A PROGRAM HISTORY</u>

70. Defendant Valadez, Jr. participated in the H-2A program as an H-2A Labor Contractor in 2015, 2016 and 2017, requesting permission to fill a total of 72 foreign worker positions in 2015, a total of 333 foreign worker positions in 2016, and a total of 406 foreign workers in 2017.

Case 5:20-cv-00205-FL   Document 50   Filed 09/28/20   Page 11 of 65

71. Defendant Valadez LLC participated in the H-2A program as an H-2A Labor Contractor for the first time in 2018 when they provided H-2A labor to various fixed-site agricultural operations including the Sleepy Creek Defendants, Defendant Cottle Farms, and Defendant Winzeler Farms.

72. In 2017 and 2018, Valadez, Jr. utilized the services of Andrew Jackson as his agent to prepare and file all of his H-2A applications with the required federal and state agencies.

73. In 2018, Valadez, Jr. and Valadez LLC ("the Valadez Defendants") also utilized the services of Andrew Jackson as their agent to prepare and file all of their H-2A applications with the required federal and state agencies.

DEFENDANTS AND THE H-2A PROGRAM IN 2018

74. The Adverse Effect Wage Rate, which is the minimum hourly rate H-2A employers are required to pay H-2A workers for work performed pursuant to the H-2A contract in North Carolina in 2018 was $11.46 per hour, effective on January 4, 2018. *See* 82 Fed. Reg. 60629 (Dec. 21, 2017).

75. The minimum daily subsistence amount to be paid to H-2A workers for food during their transportation from Mexico to the U.S. as published in the Federal Register was $12.26 in 2018. *See* 83 Fed. Reg. 12410 (Mar. 21, 2018).

76. In 2018, the Valadez Defendants rapidly expanded their H-2A labor contracting business to more than three times the size of Valadez Jr.'s H-2A workforce the prior year.

77. Prior to 2018, the highest number of H-2A employees that either of the Valadez Defendants had sought to employ during any one year was 406 employees in 2017.

78. In 2018, the Valadez Defendants sought to employ a total of 1,442 H-2A employees, over 350% the size of their entire H-2A workforce over the prior year.

79. In 2018, the Valadez Defendants submitted and received approval for two separate Applications for Temporary Employment Certification to bring workers to harvest blueberries on farms in North Carolina.

80. In 2018, on behalf of Defendant Valadez LLC, Defendant Valadez Jr. submitted an Application for Temporary Employment Certification, Form ETA-9142A ("2018 Blueberry Application") with a corresponding Agricultural and Food Processing Clearance Order ETA 790 ("2018 Blueberry Clearance Order") seeking permission to bring in and employ 750 H-2A workers from May 8, 2018 to July 24, 2018.

81. In the 2018 Blueberry Application, the Valadez Defendants certified their compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135 including:

    a. the assurance that employees will be housed at no cost in approved housing that complies with local, state, and federal safety and health standards, 20 C.F.R. § 655.122(d);

    b. the assurance that prospective members of their H-2A crew will be provided with a work contract containing all terms and conditions of employment, containing, at a minimum, all of the provisions required under 20 C.F.R. § 655.122 no later than the time at which the worker applied for a visa to work for them, 20 C.F.R. § 655.122(q);

    c. the assurance to pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period, 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

13

d. the assurance that, for those employees paid on a piece-rate basis, the H-2A employer agrees to supplement employees' wages in any pay period in which the employees' piece-rate earnings do not equal at least the amount employees would have earned had they been paid hourly at the AEWR, 20 C.F.R. § 655.122(l)(2);

e. the assurance that the employer will comply with all applicable Federal, State and local laws and regulations, including, but not limited to, the FLSA and the TVPRA, 20 C.F.R. § 655.135(e);

f. the assurance that the employer and its agents have not sought or received payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs, 20 C.F.R. § 655.135(j); and

g. the assurance that the employer has contractually forbidden any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment of H-2A workers to seek or receive payments or other compensation from prospective employees, 20 C.F.R. § 655.135(k).

82. Upon information and belief, Defendant Valadez, Jr. signed the assurances contained in the 2018 Blueberry Application on behalf of Defendant Valadez LLC under penalty of perjury.

83. USDOL approved the 2018 Blueberry Application which included the 2018 Blueberry Clearance Order. The 2018 Blueberry Clearance Order listed only two fixed-site agricultural operation work sites: Sleepy Creek Farms and Winzeler Farms. A true and correct copy of the 2018 Blueberry Clearance Order was previously filed and labeled as Exhibit J with

Plaintiffs' Complaint for Damages, Costs of Litigation, and Attorneys' Fees, ECF Doc. No. 1-1.

84. In the 2018 Blueberry Clearance Order, as the owner of Defendant Valadez LLC, Defendant Valadez Jr. certified that all workers employed pursuant to that order would be paid a minimum of $11.46 per hour for all hours worked each workweek.

85. To obtain approval to employ 750 H-2A workers, with the 2018 Blueberry Application, the Valadez Defendants included a fixed-site operation work contract with Defendant Sleepy Creek Farms dated February 20, 2018 ("2018 Sleepy Creek Farms Contract") and a fixed-site operation work contract with Defendant Winzeler Farms also dated February 20, 2018 ("2018 Winzeler Farms Contract").

86. A true and correct copy of the 2018 Sleepy Creek Farms Contract and the 2018 Winzeler Farms Contract were previously filed with Plaintiffs' Complaint for Damages, Costs of Litigation, and Attorneys' Fees and are labeled Exhibit K and Exhibit L, respectively. ECF Doc. No. 1-1.

87. The periods of time and number of total workers requested cited in the 2018 Sleepy Creek Farms Contract and the 2018 Winzeler Farms Contract mirror the exact start and end dates of work and the total number of workers requested cited in the Valadez Defendants' 2018 Blueberry Application and accompanying 2018 Blueberry Order.

88. Without the 2018 Sleepy Creek Farms Contract and the 2018 Winzeler Farms Contract, the Valadez Defendants' 2018 Blueberry Order would not have complied with 20 C.F.R. § 655.132 (b)(4) when it was submitted to USDOL for approval and would not have been approved.

89. Upon information and belief, by furnishing their respective fixed-site operation work contracts to the Valadez Defendants, the Sleepy Creek Defendants and Defendant Winzeler Farms were able to avoid certain costs of business associated with seeking H-2A Temporary Employment

15

Certification to directly employ foreign workers in 2018 to harvest blueberries on their farms, including the recruitment costs, the costs of H-2A workers' visa-processing and inbound travel expenses, other transportation costs, the cost of workers' compensation coverage, and the cost of the visa processing agent fees.

90. Prior to furnishing their respective fixed-site operation work contracts to the Valadez Defendants in 2018, the Sleepy Creek Defendants and Defendant Winzeler Farms knew or should have known that the Valadez Defendants would be unable to comply with the minimum requirements of the FLSA, NCWHA, and H-2A program, and other applicable federal and state laws and regulations for their 2018 H-2A migrant labor crews, for at least the following reasons:

    a. Because of their direct participation in the H-2A program in prior agricultural seasons, the Sleepy Creek Defendants were aware of the financial and other obligations required of H-2A employers to comply with the requirements of the program and that a significant portion of those financial obligations occur just prior to and in the beginning weeks of the blueberry season.

    b. The Sleepy Creek Defendants and Defendant Winzeler Farms' executed work contracts in 2018 with the Valadez Defendants which enabled the Valadez Defendants to seek approval for an H-2A workforce on one 2018 clearance order alone almost double the Valadez Defendants' entire H-2A workforce from the year prior.

    c. The Sleepy Creek Defendants and Defendant Winzeler Farms knew or should have known that Defendant Valadez LLC had not participated in the H-2A program prior to 2018.

    d. The Sleepy Creek Defendants were aware that the 2018 Sleepy Creek Farms Contract enabled the Valadez Defendants to obtain approval to recruit and employ an H-2A

16

workforce of 750 workers, almost double the size of the H-2A workforce that Sleepy Creek sought approval to employ to harvest blueberries on their farm just one year prior when they directly participated in the program.

e.  The Sleepy Creek Defendants and Defendant Winzeler Farms' knew or should have known that the Valadez Defendants would be required to reimburse an H-2A workforce of 750 workers more than $300,000 for their travel and visa-related costs in addition to paying their wages after their first workweek.

f.  Upon information and belief, the Sleepy Creek Defendants and Defendant Winzeler Farms' failed to adequately vet the Valadez Defendants' financial fitness and business model before providing them work contracts enabling the Valadez Defendants' to suddenly and dramatically increase the size of their H-2A workforce in 2018 for their financial gain.

91. In the 2018 Blueberry Order, as the owner of Defendant Valadez LLC, Defendant Valadez Jr. certified that the 2018 Blueberry Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job.

92. The Valadez Defendants knowingly included false and deceptive terms in the 2018 Blueberry Order with intent to defraud, including but not limited to:

a.  the assurance that the Valadez Defendants and their agents had not sought or received payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs,

b.  the assurance that the Valadez Defendants contractually forbade any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom

the employer engages, either directly or indirectly, in international recruitment of H-2A workers to seek or receive payments or other compensation from prospective employees,

    c.  that the Valadez Defendants had sufficient funds available to pay the wages promised;

    d.  that Defendants Sleepy Creek Farms and Winzeler Farms had work available for 750 workers for the asserted time period;

    e.  that workers would be paid in accordance with the 2018 Blueberry Order;

    f.  that the Valadez Defendants would pay $11.46 per hour for each hour worked by workers employed pursuant to the Order;

    g.  that the 2018 Blueberry Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job; and

    h.  that workers would be housed in approved housing that complied with local, state, and federal safety and health standards.

93. Upon information and belief, the Valadez Defendants knew the assurances were false at the time that they swore that the assurances were accurate.

94. Upon information and belief, the Valadez Defendants did not intend to comply with the assurances sworn to in the 2018 Blueberry Application and Order.

95. Through Defendant Valadez Jr.'s sworn assurances on behalf of Defendant Valadez LLC attesting to their compliance in the 2018 Blueberry Application, the Valadez Defendants deliberately misrepresented their intent to comply with federal, state and local laws because the USDOL would not have approved their application and accompanying order without the sworn assurances.

96. Upon information and belief, the Valadez Defendants did not have sufficient funds to pay the wages and salary offered in the 2018 Blueberry Order and was dependent upon income from Defendants Sleepy Creek and Winzeler Farms in order to pay such wages and benefits.

97. Upon information and belief, the Valadez Defendants did not intend to comply with all applicable federal, state and local employment-related laws, in that they did not intend to pay for workers' transportation, recruitment, and visa costs, as required by the FLSA, the NCWHA, and the H-2A regulations.

98. Further, the information contained in the 2018 Blueberry Order was false because it greatly overstated the labor needs of each of the farms, both in terms of the number of workers needed and the period of employment.

99. In 2018, on behalf of Defendant Valadez LLC, Defendant Valadez Jr. submitted a second Application for Temporary Employment Certification, Form ETA-9142A ("2018 Varied Crop Application") with a corresponding Agricultural and Food Processing Clearance Order ETA 790 ("2018 Varied Crop Clearance Order") seeking permission to bring in and employ 344 H-2A workers from May 8, 2018 to November 28, 2018.

100.    In the 2018 Varied Crop Application, the Valadez Defendants certified their compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135 including

101.    the assurance that employees will be housed at no cost in approved housing that complies with local, state, and federal safety and health standards, 20 C.F.R. § 655.122(d);

   a.   the assurance that prospective members of their H-2A crew will be provided with a work contract containing all terms and conditions of employment, containing, at a minimum, all of the provisions required under 20 C.F.R. § 655.122 no later than the time at which the worker applied for a visa to work for them, 20 C.F.R. § 655.122(q);

Case 5:20-cv-00205-FL   Document 50   Filed 09/28/20   Page 19 of 65

b. the assurance to pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period, 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

c. the assurance that, for those employees paid on a piece-rate basis, the H-2A employer agrees to supplement employees' wages in any pay period in which the employees' piece-rate earnings do not equal at least the amount employees would have earned had they been paid hourly at the AEWR, 20 C.F.R. § 655.122(l)(2);

d. the assurance that the employer will comply with all applicable Federal, State and local laws and regulations, including, but not limited to, the FLSA and the TVPRA, 20 C.F.R. § 655.135(e);

e. the assurance that the employer and its agents have not sought or received payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs, 20 C.F.R. § 655.135(j); and

f. the assurance that the employer has contractually forbidden any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment of H-2A workers to seek or receive payments or other compensation from prospective employees, 20 C.F.R. § 655.135(k).

102. Upon information and belief, Defendant Valadez, Jr. signed the assurances contained in the 2018 Varied Crop Application on behalf of Defendant Valadez LLC under penalty of perjury.

103. USDOL approved the 2018 Varied Crop Application which included the 2018 Varied Crop Clearance Order. The 2018 Varied Crop Clearance Order listed 17 fixed-site growers.

104. A true and correct copy of the 2018 Varied Crop Clearance Order was previously filed and labeled as Exhibit M with Plaintiffs' Complaint for Damages, Costs of Litigation, and Attorneys' Fees, ECF Doc. No. 1-1.

105. A true and correct copy of the fixed-site operation work contracts submitted with the 2018 Varied Crop Clearance Order were previously filed and labeled as Exhibit N with Plaintiffs' Complaint for Damages, Costs of Litigation, and Attorneys' Fees, ECF Doc. No. 1-1.

106. To obtain approval to employ 344 H-2A workers, with the 2018 Varied Crop Application, the Valadez Defendants included a fixed-site operation work contract with Defendant Cottle Farms dated January 25, 2018 and then updated again on March 20, 2018 ("2018 Cottle Farms Contract") included among the contracts filed as Exhibit N.

107. The period of time and the number of workers cited in the 2018 Cottle Farms Contract mirror the exact start and end dates of work and the total number of workers requested in the Valadez Defendants' 2018 Varied Crop Application and accompanying 2018 Varied Crop Order.

108. Without work contracts with fixed-site agricultural operations including the 2018 Cottle Farms Contract, Valadez Defendants' 2018 Varied Crop Order would not have complied with 20 C.F.R. § 655.132 (b)(4) when it was submitted to USDOL for approval and would not have been approved.

109. Upon information and belief, by furnishing the 2018 Cottle Farms Contract to the Valadez Defendants, Defendant Cottle Farms were able to avoid certain costs of business associated with directly seeking H-2A Temporary Employment Certification to employ foreign workers in 2018

to harvest blueberries on their farm including the recruitment costs, the costs of H-2A workers' visa-processing and inbound travel expenses, other transportation costs, housing costs, the cost of workers' compensation coverage, and the cost of the visa processing agent fees.

110. Prior to furnishing the 2018 Cottle Farms Contract to the Valadez Defendants, Defendant Cottle Farms knew or should have known that the Valadez Defendants would be unable to comply with the minimum requirements of the FLSA, NCWHA, and H-2A program, and other applicable federal and state laws and regulations, for at least the following reasons:

    a. Because of their direct participation in the H-2A program in prior agricultural seasons, Defendant Cottle Farms was aware of the financial and other obligations required of H-2A employers to comply with the requirements of the program and that a significant portion of those financial obligations occur just prior to and in the beginning weeks of the blueberry season.

    b. Defendant Cottle Farms knew or should have known that Defendant Valadez LLC had not participated in the H-2A program prior to 2018.

    c. Defendants Cottle Farms was aware that the 2018 Cottle Farms Contract enabled the Valadez Defendants to obtain approval to recruit and employ an H-2A workforce of 344 workers, more than triple the size of the H-2A workforce their work contract with the Defendant Valadez Jr. for an H-2A workforce just one year prior.

    d. Defendant Cottle Farms knew or should have known that the Valadez Defendants would be required to reimburse an H-2A workforce of 344 workers more than $137,000 for their travel and visa-related in addition to paying their wages after their first workweek.

    e. Upon information and belief, Defendant Cottle Farms failed to adequately vet the Valadez Defendants' financial fitness and business model before providing him the 2018

Cottle Farms Contract enabling the Valadez Defendants' to suddenly and dramatically increase the size of their H-2A workforce in 2018 for their financial gain.

111. In the 2018 Varied Crop Clearance Order, as the owner of Defendant Valadez LLC, Defendant Valadez Jr. certified that all workers employed pursuant to that order would be paid a minimum of $11.46 per hour for all hours worked each workweek.

112. In the 2018 Varied Crop Order, as the owner of Defendant Valadez LLC, Defendant Valadez Jr. certified that the 2018 Varied Crop Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job.

113. The Valadez Defendants knowingly included false and misleading terms in the 2018 Varied Order with intent to defraud, including but not limited to, assurance that:

    a. the Valadez Defendants and their agents had not sought or received payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs,

    b. the Valadez Defendants contractually forbade any foreign labor contractor or recruiter (or any agent of such foreign labor contractor or recruiter) whom the employer engages, either directly or indirectly, in international recruitment of H-2A workers to seek or receive payments or other compensation from prospective employees,

    c. that the Valadez Defendants had sufficient funds available to pay the wages promised;

    d. that Defendant Cottle Farms had work available for up to 344 workers for the asserted time period;

    e. that workers would be paid in accordance with the 2018 Varied Crop Order;

f.  that the Valadez Defendants would pay $11.46 per hour for each hour worked by workers employed pursuant to the Order;

g.  that the 2018 Varied Crop Order described the actual promised terms and conditions of the employment being offered and all the material terms and conditions of the job; and

h.  that workers would workers would be housed in approved housing that complied with local, state, and federal health and safety standards.

114.  Upon information and belief, the Valadez Defendants knew the assurances were false at the time that they swore that the assurances were accurate.

115.  Upon information and belief, the Valadez Defendants did not intend to comply with the assurances sworn to in the 2018 Varied Crop Application and Order.

116.  Through Defendant Valadez Jr.'s sworn assurances on behalf of Defendant Valadez LLC attesting to their compliance in the 2018 Varied Crop Application, the Valadez Defendants deliberately misrepresented their intent to comply with federal, state and local laws because USDOL would not have approved their application and accompanying order without the sworn assurances.

117.  In fact, upon information and belief, the Valadez Defendants did not have sufficient funds to pay the wages and salary offered and was dependent upon income from Defendant Cottle Farms in order to pay such wages and benefits for the blueberry harvest.

118.  Upon information and belief, the Valadez Defendants did not intend to comply with all applicable federal, state and local employment-related laws, in that they did not intend to pay for workers' transportation, recruitment, and visa costs, as required by the FLSA, the NCWHA, and the H-2A regulations.

119.   Further, the information contained in the 2018 Varied Order was false because it greatly overstated labor needs of Cottle Farms, both in terms of the number of workers needed and the period of employment.

120.   In 2018, the Valadez Defendants submitted three other Applications for Temporary Employment Certification seeking permission to bring in and employ an additional 348 H-2A workers to work and live at various sites in North Carolina, Ohio, and Mississippi.

<u>FOREIGN RECRUITMENT OF PLAINTIFFS</u>

121.   Upon information and belief, in preparation for and during the 2018 season, the Sleepy Creek Defendants and Defendant Cottle Farms provided specialized training to the Valadez Defendants including training regarding food safety protocols during the harvesting of blueberries on their farms.

122.   Upon information and belief, in preparation for the 2018 season, Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms directed the Valadez Defendants on matters regarding the recruitment of the Valadez' 2018 H-2A farm labor crew, including Plaintiffs.

123.   The Valadez Defendants directed and utilized various agents in Mexico to recruit foreign workers for the 2018 Blueberry and 2018 Varied Crop Clearance Orders.

124.   Defendant Valadez Jr. also personally travelled to the Mexican states of Guanajuato and Chiapas to recruit foreign workers to come to the U.S. to perform farm work for the Valadez Defendants for the 2018 season.

125.   Defendant Valadez Jr. attended meetings with potential recruits for his 2018 H-2A crew in Chiapas together with his recruiting agents in that region.

126. By and through their agents in Mexico, the Valadez Defendants required Plaintiffs to - as a condition of their employment - pay large recruitment fees to Valadez Defendants' agents upfront or promise to pay large fees from their earnings once they began working for them in the U.S.

127. The Valadez Defendants' agents enticed these Plaintiffs to pay or agree to pay these fees with fraudulent and deceptive promises concerning number of hours to be worked by Plaintiffs and wages Plaintiffs would be paid for those promised hours of work.

128. These fraudulent and deceptive promises included, but were not limited to, promises of immediate and abundant work in farm work, pay of at least $11.46 per hour for each hour worked by each Plaintiff, and housing that would comply with local, state, and federal law.

129. The Valadez Defendants' agents promised Plaintiffs Moshan-Martinez, Casillas-Serrano, De la Rosa-Alvarado, Gomez-Gonzalez, Gomez-Santiz, Hernandez-Martinez, Lopez-Arcos, and Lopez-Lopez H-2A visas to work in farm work for Defendants for a six month period.

130. The Valadez Defendants' agent promised Plaintiff Jimenez-Giron an H-2A visa for a two-and-a-half-month period with the possibility of an extension of up to a year if she wanted a visa extension after she arrived.

131. In reliance on the Valadez Defendants' promises to them, Plaintiffs Moshan-Martinez, Casillas-Serrano, Gomez-Gonzalez, Gomez-Santiz, Hernandez-Martinez, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez made payments ranging from 16,000 Mexican pesos (about $800 U.S. dollars in 2018) to 50,000 Mexican pesos (about $2,500 U.S. dollars in 2018) in recruitment fees for the opportunity to work with Defendants on a legal work visa in North Carolina.

132.    In reliance on the Valadez Defendants' promises to him, Plaintiff De la Rosa-Alvarado made an initial upfront payment of 35,000 Mexican pesos (about $1,750) as a recruitment fee. The Valadez Defendants' agents required him to promise to pay an equal amount from his future earnings while working for Defendants in North Carolina.

133.    As collateral, the Valadez Defendants' agent required Plaintiff De la Rosa-Alvarado to physically leave the title to his family home with the Valadez Defendants' agent in Mexico while Plaintiff De la Rosa-Alvarado was working for Defendants in North Carolina to ensure payment of this second installment.

134.    In addition to meeting with potential workers to make promises regarding the terms and conditions of employment and to collect recruitment fees, the Valadez Defendants' agents gave potential workers, including Plaintiffs, instructions on how to apply for and get an H-2A visa, such as when to travel to Monterrey, Mexico to obtain the visa, where to stay, when to report to the U.S. Consulate for the visa interview, how to conduct themselves in the interview, and when and how to depart for the job in North Carolina.

135.    The Valadez Defendants' agents also met with Plaintiffs to collect information for their visa applications including their home addresses in Mexico, their spouse's name and address in Mexico, and their passport information.

136.    The Valadez Defendants' agents required all Plaintiffs to pay them an additional payment of about 5,000 Mexican pesos each (about $250 U.S. dollars in 2018) prior to their trip to the U.S. Consulate in Monterrey.

137.    Plaintiffs understood that this payment was to be allocated to the cost of the visa and any processing fees such as legal fees or paperwork associated with procuring the visa (hereinafter, the "visa-related fee").

138. This amount for the visa-related fee was in addition to the fees previously paid, or promised to be paid, to the Valadez Defendants via Defendants' local recruiting agents, as described above.

139. The Valadez Defendants failed to provide Plaintiffs with a work contract containing all terms and conditions of employment, containing, at a minimum, all of the provisions required under 20 C.F.R. § 655.122, no later than the time at which the Plaintiffs applied for a visa to work for them.

140. The Valadez Defendants' failure constituted a violation of 20 C.F.R. § 655.122(q).

141. By and through their agents, the Valadez Defendants instructed Plaintiffs to depart from their homes in the Mexican states of Chiapas and Guanajuato to travel to the U.S. Consulate in Monterrey, Mexico.

142. Prior to their departure from their homes, the Valadez Defendants failed to notify Plaintiffs of all of the additional travel-related expenses that they would be required to incur, at their personal expense, during their trip to the U.S. to work for them.

143. At the direction of the Valadez Defendants' agents in Mexico, Plaintiffs travelled from their homes in the Mexican states of Chiapas and Guanajuato to the U.S. Consulate in Monterrey, Mexico waiting for their visas to be issued.

144. Plaintiffs incurred, at personal expense, the costs of travel from their homes to the U.S. Consulate in Monterrey.

145. Because of the timing of this process, Plaintiffs also incurred, at personal expense, the costs of paying for lodging arranged by the Valadez Defendants for several nights in a hotel in Monterrey near the Consulate.

146.    In Monterrey, the Valadez Defendants' agents provided Plaintiffs receipts showing their payment of the visa-related fee noted in paragraph 134. These receipts indicate a total payment of $250 U.S. dollars to "BMP Servicios Internacionales," including a $190 U.S. dollar line item for the visa and a $60 U.S. dollar line item attributed to fees.

147.    In Monterrey, on or around May 9, 2018, the Valadez Defendants' agents distributed to Plaintiffs a 2-page Employee Declaration Form copyrighted by Andrew M. Jackson, Attorney at Law, that stated, in part, that the signing party understood that they would be terminated if they paid or gave anything of value for the opportunity to work for Defendants.

148.    Plaintiffs, having already paid recruitment fees and traveled from their homes to Monterrey, felt they had no choice but to sign the forms described in the preceding paragraph if they were to recoup the money already paid by travelling to North Carolina to work, and they signed the forms.

149.    Further, the Valadez Defendants' agents in Monterrey distributed a document to Plaintiffs which set forth probable questions to be given to them in the U.S. consular interview as well as scripted answers. The Valadez Defendants' agents then instructed them that if they failed to memorize and recite the scripted answers as written on the Consular Interview Script, they would not be granted the visa to work in the U.S.

150.    The Valadez Defendants distributed one of two versions of the script to each Plaintiff. One version of the script contained instructions and answers for workers applying for a 6 month visa with Defendant Valadez LLC ("6 Month Visa Consular Interview Script") and another version contained instructions and answers for workers applying for a two-and-a-half month visa with Defendant Valadez LLC ("2 Month Visa Consular Interview Script").

29

151.   The 6 Month Visa Consular Interview Script contained instructions to respond, when prompted and that they had been promised a rate of $10.46 U.S. dollars per hour to work in various crops for Defendant Valadez LLC.

152.   The 2 Month Visa Consular Interview Script contained instructions to respond, when prompted, that they had been promised a rate of $11.46 U.S. dollars per hour to work in blueberries for Defendant Valadez LLC.

153.   Both sets of consular interview scripts instructed Plaintiffs to respond, when prompted, that they had not paid anything for their visas and that their employer had paid all of their expenses on their behalf to a representative named Miguel Patricio Sebastian. Both scripts warned Plaintiffs not to bring the script with them to the Consular Interview.

154.   Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez received visas associated with the 2018 Varied Crop Order for 6 months.

155.   However, Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron, received visas associated with the 2018 Blueberry Order for only two and a half months.

156.   The short length of the visa they received was a devastating surprise to Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez because the Valadez Defendants had fraudulently and deceptively promised them visas for 6 months when the Valadez Defendants charged them recruitment fees.

157.   Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez had relied on those promises of the Valadez Defendants when paying recruitment and visa fees and paying to travel to the U.S. Consulate to obtain their H-2A visas.

30

158. Had Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez known that they would have received a visa for only two and a half months instead of the six month visa that Defendants' agents promised them, they would not have made the financial investment that they did to work for Defendants.

159. Plaintiffs traveled from Monterrey, Mexico to the border near Laredo, Texas in a bus arranged by the Valadez Defendants. The Valadez Defendants' agents required Plaintiffs to pay them for this transportation.

160. The Valadez Defendants then transported Plaintiffs from the border near Laredo, Texas to North Carolina.

161. In total, in addition to the recruitment fee and the visa-related fee, Plaintiffs incurred additional costs, at personal expense, including the cost of travel from their various hometowns to the U.S. Consulate in Monterrey, Mexico; transport within Monterrey; bus travel from Monterrey to Nuevo Laredo, Mexico; lodging in Monterrey awaiting the interview process; the border crossing fee; and meals during the several days of travel.

162. In total, Plaintiffs travelled for approximately 10 days from the place where they were recruited in Mexico to Defendants' jobsites in North Carolina.

163. The actual inbound travel expenses that the Valadez Defendants required Plaintiffs to incur, separate and apart from the recruitment fees and visa-related fees the Valadez Defendants required Plaintiffs to pay, were greater than many Plaintiffs anticipated and many Plaintiffs and their co-workers depleted the remaining funds available to them just to complete their trip to North Carolina for the job.

164.     When the Plaintiffs arrived in North Carolina, the Valadez Defendants transported them to a tract of land owned by Defendant Valadez Jr. adjacent to his residence located at 1345 Preston Road in Smithfield, North Carolina in Johnston County ("Defendant Valadez Jr.'s Smithfield Property").

165.     Upon information and belief, Francisco Valadez, Sr., the father of Defendant Valadez, Jr., had access to the residence on Defendant Valadez Jr.'s Smithfield Property when he is in North Carolina.

166.     Francisco Valadez, Sr. performed farm labor contracting activities as defined by 29 U.S.C. § 1802(7) in that, for any money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished or employed migrant agricultural workers for the Valadez Defendants' 2018 H-2A crew.

167.     At Defendant Valadez Jr.'s Smithfield Property, the Valadez Defendants required Plaintiffs to make their passports and Mexican credentials available to the Valadez Defendants' secretarial staff and to sign paperwork. Some of this paperwork was in English and the Valadez Defendants did not provide Plaintiffs with copies of what they asked Plaintiffs to sign.

168.     Plaintiffs could not read the written English or understand what the paperwork said, but they felt scared and pressured because of their indebted state due to Defendants' recruitment fees and the inbound travel and visa-related expenses they had just incurred to work for Defendants. They felt like they had no other choice, but to sign the documents, and, therefore, did sign the paperwork.

169.    After signing paperwork at Defendant Valadez Jr.'s Smithfield Property, these Defendants housed Plaintiffs Casillas-Serrano and Hernandez-Martinez at that property. At the Smithfield Property, the Valadez Defendants failed to provide Plaintiffs Casillas-Serrano and Hernandez-Martinez humane accommodations.

170.    The Valadez Defendants housed the other Plaintiffs at different locations as described below.

171.    The accommodations at this Smithfield property did not comply with the North Carolina Migrant Housing Act ("NCMHA"), N.C. Gen. Stat. § 95.222, *et seq.* in that the Valadez Defendants required Plaintiffs Casillas-Serrano and Hernandez-Martinez to sleep in a bus parked at Defendant Valadez Jr.'s Smithfield Property for one night and then to sleep outside, without any protective structure, fully exposed to the elements, the following night.

172.    During this time, Plaintiffs Casillas-Serrano and Hernandez-Martinez had no way to purchase and/or prepare meals, launder their clothing, or bathe. These Plaintiffs had no choice but to request permission to enter a nearby home, which they believed to be occupied by Valadez, Sr.'s estranged wife, to access a toilet.

173.    On their third day in North Carolina, the Valadez Defendants transported Plaintiffs Casillas-Serrano and Hernandez-Martinez to a nearby motel ("Smithfield Motel Labor Camp") to bathe in a room that was occupied at that time by other workers on the Valadez Defendants' farm labor crew. After they bathed, the Valadez Defendants then transported them back to Defendant Valadez Jr.'s Smithfield Property.

174.    On the third night, the Valadez Defendants transported Plaintiffs Casillas-Serrano and Hernandez-Martinez to a migrant labor camp in Garland, North Carolina ("Garland Labor Camp").

175.    The Valadez Defendants housed Plaintiffs Moshan-Martinez, De la Rosa-Alvarado, Gomez-Gonzalez, and Lopez-Lopez in an isolated labor camp off of Moses Register Lane in Dunn, North Carolina ("Dunn Labor Camp").

176.    The Dunn Labor Camp did not comply with the NCMHA. Among other violations, the Valadez Defendants provided Plaintiffs soiled mattresses in disrepair, the labor camp had only two toilets that were functional for over 50 labor camp occupants, and the shower spigots were not all functional, and there was no hot water supply to bathe with, prepare foods, and launder their clothing.

177.    When the Valadez Defendants left these Plaintiffs at the Dunn Labor Camp, there was no hot water supply for them to bathe with, prepare foods, and launder their clothing.

178.    Plaintiffs Moshan-Martinez, De la Rosa-Alvarado, Gomez-Gonzalez, and Lopez-Lopez

179.    The Dunn Labor Camp did not provide reasonable protection for inhabitants from insects and rodents. Plaintiffs and their coworkers encountered and killed multiple snakes in the interior areas of the labor camp barracks, including a snake in the Dunn Labor Camp kitchen.

180.    The Valadez Defendants transported Plaintiffs Moshan-Martinez, De la Rosa-Alvarado, Gomez-Gonzalez, and Lopez-Lopez to the Dunn Labor Camp in the early morning hours of May 14, 2018, when they first arrived in North Carolina, and left them for over 12 hours. Because they had no independent means of transport, those Plaintiffs and their co-workers searched the surrounding area on foot for stores to purchase food. However, due to the rural isolation of the labor camp location and their complete lack of knowledge about the area, they were not able to

34

locate food sources. They also did not know when anyone who would know how to find food would be in contact with them. Plaintiffs Moshan-Martinez, De la Rosa-Alvarado, Gomez-Gonzalez, and Lopez-Lopez had arrived without sufficient food to eat and suffered anxiety over how they would obtain food and other necessary provisions in the future.

181. The Valadez Defendants housed Plaintiffs Gomez-Santiz and Lopez-Arcos in an isolated labor camp off of Langdon Road in Angier, North Carolina, ("Angier Labor Camp").

182. The Angier Labor Camp did not comply with the NCMHA. Among other violations, the Valadez Defendants failed to turn on the water supply when Plaintiffs arrived leaving them without any water for several days. When the water was turned on, there was no hot water to bathe with, launder their clothing, and safely prepare their food.

183. The Angier Labor Camp did not have reasonable protection for inhabitants from insects and rodents, as the camp was infested with both. Plaintiffs staying at Angier Labor Camp and their coworkers found and killed a large snake in their sleeping area.

184. The Valadez Defendants initially housed Plaintiff Jimenez-Giron at the Smithfield Motel Labor Camp.

185. The Valadez Defendants then housed Plaintiff Jimenez-Giron in an isolated labor camp accessed by Sleepy Creek Drive in Harrells, North Carolina, ("Sleepy Creek Labor Camp").

186. In 2018, the Sleepy Creek Labor Camp was registered with the North Carolina Department of Labor by Goldsboro Milling Co., with multiple structures with the total capacity to house approximately 476 occupants.

187. The Sleepy Creek Labor Camp is a remote camp hidden from view of the public road and can only be accessed by two concealed dirt roads that are gated at the entrance from the public road.

188. During the 2018 season, the geographic area in which the Sleepy Creek Labor Camp was located lacked coverage by most major cell phone companies which meant it was necessary to drive several miles from the camp to successfully make a phone call, use an internet-based text or voice messaging service, or otherwise access information online.

189. During this time, the Valadez Defendants and the Sleepy Creek Defendants regularly consulted with each other to monitor, control, and, at times, prohibit outside visitors to the Sleepy Creek Labor Camp during the worker occupants', including Plaintiff Jimenez-Giron's, non-work hours.

190. When Plaintiff Jimenez-Giron was housed at the Sleepy Creek Labor Camp, the Valadez Defendants or Sleepy Creek Defendants caused the gates to the only public entrances to the Sleepy Creek Labor Camp to be closed and secured with a metal chain and multiple locked padlocks before and after buses transporting workers entered and exited the confines of the camp.

## VALADEZ DEFENDANTS USED DEBT AND ISSUED THREATS TO PREVENT WORKER ESCAPE PRIOR TO THE HARVEST

191. The Valadez Defendants caused Plaintiffs to depart their hometowns in Mexico on or around May 4, 2018 to arrive in North Carolina to work for them.

192. The Valadez Defendants did not make work available to their 2018 H-2A farm labor crew until on or around May 16, 2018 and/or May 17, 2018, approximately 12 to 13 days after their H-2A crew had departed from their hometowns in Mexico.

193. Plaintiffs and their coworkers had to wait several days between arriving in North Carolina and being provided work by Defendants, which meant they were stuck at their migrant labor camps without any income during that time.

194. Because many workers on the crew, including Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Gomez-Santiz, Hernandez-Martinez, Jimenez-Giron, and Lopez-Arcos, had exhausted their remaining savings on undisclosed and unanticipated travel expenses to travel from their hometowns in Mexico to North Carolina, they did not have money to buy groceries to prepare their meals nor transportation to a store to purchase food. During this waiting period in North Carolina, Plaintiffs suffered because they did not have enough food to eat.

195. Defendant Valadez, Jr. personally, and by and through the Valadez Defendants' agents, convened multiple meetings in North Carolina and announced to his farm labor crew, including Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez, that the Valadez Defendants would not pay an hourly minimum wage and, instead, would only pay a piece rate of $2.50 per bucket of harvested blueberries regardless of the number of hours worked to harvest the berries.

196. Without enough food or work, workers at the Valadez Defendants' and the Sleepy Creek Defendants' labor camp sites began to flee the labor camps.

197. As a result, Defendant Valadez, Jr. personally, and by and through the Valadez Defendants' agents, convened various meetings at Plaintiffs' labor camps where he threatened the remaining workers, including Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez, that he would report the people who had left to U.S. Immigration authorities and, that if the remaining workers also left, he would report them to the U.S. government as well so that they would be made inadmissible for lawful entry into the U.S. in the future.

198.    Upon information and belief, the Valadez Defendants provided labor to and/or supervised their 2018 H-2A farm labor crew, including Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez on various farms, including the farming operations operated by the Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms.

199.    The blueberry farms operated by the Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms were the only farms that referenced blueberry harvesting in the fixed-site agricultural operation work contracts provided to the Valadez Defendants for their 2018 Blueberry and Varied Crop Applications.

200.    The Valadez Defendants transported Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez between the blueberry farm worksites and their labor camp housing and never told those Plaintiffs the name or address of the blueberry farm worksites.

201.    Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez do not know where exactly the Valadez Defendants took them to work harvesting blueberries because they were  unfamiliar with the area,  the blueberry fields were in isolated, rural areas lacking distinctive geographic points of reference,  and because they were always transported there by their employers.

202.    Upon information and belief, the Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms received a financial benefit, including increased harvest and profits, by using the Valadez Defendants to furnish farmworkers, including Plaintiffs, to harvest crops on their farms in 2018.

203. Because the Valadez Defendants provided their farm labor crew to multiple farming operations, some of which had more than one field site being cultivated or harvested simultaneously, the Valadez Defendants also relied on the operators of the fixed-site farming operations, including the Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms, to jointly oversee activities related to the housing, training, supervision, and field work of their crew during the 2018 season.

204. Upon information and belief, in preparation for and during the 2018 season, the Sleepy Creek Defendants, Defendant Winzeler Farms, and Defendant Cottle Farms regularly directed the Valadez Defendants on matters regarding the transportation, housing, and supervision of Valadez' H-2A farm labor crew on their respective farming operations.

205. On some workdays, the Valadez Defendants required Plaintiffs Moshan-Martinez, Isaias Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez to wait for extended periods of time on the bus at the worksite or elsewhere at the worksite before the Valadez Defendants' supervisors directed them to begin harvesting.

206. For example, on May 17, 2018, the Valadez Defendants required Plaintiffs Moshan-Martinez, Gomez-Gonzalez, and Lopez-Lopez to wait approximately six hours after arriving at a blueberry farming operation before the Valadez Defendants' supervisors directed them to begin harvesting.

207. Because of the isolated location of the blueberry fields and the requirement to be ready to begin harvesting in the field at any time, Plaintiffs Moshan-Martinez, Isaias Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez were not able to effectively use the time they waited for their own purposes during these wait times.

208.    Defendants assigned Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez to fields without sufficient mature fruit to harvest.

209.    When the Valadez Defendants required workers to depart their hometowns in Mexico to travel to North Carolina to work for them, Defendants knew, or should have known, that there would not be sufficient ripe berries at that point in the season to provide as much work or pay to the Plaintiffs and other H-2A workers as the Valadez Defendants and their agents had promised.

<u>UNLAWFUL PAY PRACTICES</u>

210.    On Saturday, May 19, 2018, the Valadez Defendants transported Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers to Defendant Valadez Jr.'s Smithfield Property to receive their first pay.  Because there were hundreds of workers, they were required to wait outside in inclement weather for many hours while the Valadez Defendants distributed the pay.

211.    The Valadez Defendants transported Plaintiff Jimenez-Giron and other workers housed at the Sleepy Creek Labor Camp an hour and a half to this Smithfield pay day event.

212.    Despite requiring that she wait from the early morning through the evening  at Defendant Valadez Jr.'s Smithfield Property in inclement weather, the Valadez Defendants did not pay Plaintiff Jimenez-Giron anything and told her that she would be transported back to the Sleepy Creek Labor Camp that evening.

213.    The Valadez Defendants' agents instructed Plaintiff Jimenez-Giron that she would have to return the following day to receive her first pay.

214. The Valadez Defendants failed to reimburse Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers during their first workweek for the fees they incurred in Mexico to get the job, including the fees they had to pay to the Valadez Defendants' agents in Mexico and their travel-related expenses including their inbound subsistence costs, border crossing fee, transportation within Mexico, hotel costs, visa fee, and visa processing-related fee.

215. During this pay day event, the Valadez Defendants provided Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, and Lopez-Arcos each a wage statement which says they were each reimbursed $401.50, but the Valadez Defendants did not actually pay this money to these Plaintiffs or to their similarly situated co-workers.

216. As a pre-condition to receive any wages for their blueberry harvesting work on payday, the Valadez Defendants required Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, and Lopez-Arcos to sign an acknowledgement that the Valadez Defendants had reimbursed them $401.50 for inbound travel and visa-related expenses, although that was not true.

217. Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, and Lopez-Arcos felt they had no choice but to sign the false reimbursement acknowledgement because they desperately needed to get paid for their work. They each felt scared because of the Valadez Defendants' threats, and pressure because of their indebted state, their recent scare with food insecurity, and the need to provide for their families.

218. Defendants' failure to reimburse Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers for these travel and visa-related fees, incurred primarily for the benefit of Defendants, in their

first workweek brought Plaintiffs' pay below the FLSA minimum wage and the NCWHA promised wage for work performed that week.

219. For their blueberry harvesting work, Defendants paid Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers in cash and either provided these Plaintiffs paystubs with fictitious information, or failed to provide paystubs at all.

220. The Valadez Defendants provided Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, and Lopez-Arcos and at least some of their co-workers paystubs that were deliberately fabricated to include false information about the hours worked and the pay received in order to make it appear as if the Valadez Defendants were complying with the requirements of an H-2A employer.

221. The Valadez Defendants failed to provide Plaintiff Lopez-Lopez a pay-related document at all.

222. For this workweek, Defendants failed to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers at least the product of the $11.46 per hour AEWR and their total hours worked. Since the $11.46 per hour AEWR was the wage promised by their employment contract and the H-2A regulations, Defendants thereby failed to pay the NCWHA promised wage due for work performed that week.

223. For this workweek, Defendants also failed to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their similarly situated co-workers at least the product of the $7.25 FLSA federal minimum wage rate and their total hours worked.

224.     Indebted and with far less income than they anticipated, Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez feared that if they left the Defendants' employ, they would not be able to repay their debts and support themselves and their families back in Mexico.

ESCALATION OF THE VALADEZ DEFENDANTS' THREATS DURING THE HARVEST

225.     Amid the oppressive living and working conditions, additional workers at the Valadez Defendants' and the Sleepy Creek Defendants' labor camp sites continued to flee.

226.     The Valadez Defendants' on-site supervisors informed Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Jimenez-Giron, and Lopez-Lopez that Defendant Valadez, Jr. planned to immediately start confiscating worker passports so that the remaining workers could not leave.

227.     The Valadez Defendants' on-site supervisors made it known to Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez that Defendant Valadez, Jr. directed them and their other agents to extract additional fees from the workers that left the Valadez Defendants' employ before the end of their H-2A contract, including by visiting Plaintiffs' families in Mexico to demand additional fees.

228.     The Valadez Defendants' on-site supervisors made it known to Plaintiffs Gomez-Santiz and Lopez Arcos that Defendant Valadez, Jr. directed them to demand to hold property titles and other things of value as collateral from foreign workers who had come to work for Defendants after Plaintiffs, to prevent those workers from leaving prior to the completion of their contract.

229.     After Plaintiffs were finally able to escape, Plaintiffs Moshan-Martinez, Casillas-Serrano, Gomez-Gonzalez, Gomez-Santiz, Hernandez-Martinez, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez did not proactively contact the Valadez Defendants' agents in Mexico or

otherwise provide any information that they were no longer working for the Valadez Defendants in North Carolina.

230.    However, after their escape, Defendant Valadez, Jr. personally, and by and through his agents in North Carolina and Mexico, then threatened Plaintiffs Moshan-Martinez, Casillas-Serrano, Gomez-Gonzalez, Gomez-Santiz, Hernandez-Martinez, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and their co-workers with serious harm.

231.    All Plaintiffs also feared for their personal safety and the safety of their families in Mexico when they learned from their former co-workers that they experienced similar threats.

<u>FLSA COLLECTIVE ACTION ALLEGATIONS</u>

232.    Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez bring this claim under the FLSA pursuant to the collective action procedure specified in  29 U.S.C. § 216(b) for themselves and all other similarly situated persons who were or will be employed by Defendants at any time in the time period starting with the first date in the three (3) year time period immediately preceding the date on which such person files a Consent to Sue in this action pursuant to 29 U.S.C. § 216(b), and ending with the date final judgment is entered in this action.

233.    This FLSA collective action is for all workweeks in which Plaintiffs and the members of this FLSA collective action were or will not be paid at the hourly rate required by 29 U.S.C. § 206.

234.    This collective action is based upon the willful failure of Defendants to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and the members of this collective action wages free and clear on or before their regular

payday for each workweek at the minimum wage rate required by 29 U.S.C. § 206 for each hour or part of an hour worked by Plaintiffs and members of the collective action.

## FIRST CLAIM FOR RELIEF

### (FAIR LABOR STANDARDS ACT)

235. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

236. Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez bring this claim for Defendants' violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq,* on behalf of themselves and all others similarly situated.

237. Plaintiffs have consented in writing to bring this FLSA action. Their written consents were previously filed with Plaintiffs' Complaint for Damages, Costs of Litigation, and Attorneys' Fees labeled as **Error! Reference source not found.** through Exhibit I. ECF Doc. No. 1-1.

238. Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and the members of the collective action described in Paragraphs 231 through 233 at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which they were employed.

239. The violations of the minimum wage provisions of the FLSA resulted, in part, from Defendants' failure to reimburse Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action during their first week of employment for expenses incurred primarily for the benefit of Defendants, including recruitment fees, their inbound subsistence costs, lodging expenses near the U.S.

Consulate, visa fees and visa-related processing fees, issuance of Form I-94, and the full cost of travel from their homes to Defendants' jobsite. When these expenses are calculated as deductions from their first week's pay, as required by law, they cause those Plaintiffs' and the members of the collective action's first week's earnings to be less than the FLSA minimum wage.

240. The violations of the minimum wage provisions of the FLSA also resulted from Defendants' failure during various weeks to compensate Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action at the minimum wage rate for all hours worked when Defendants paid Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action a piece rate that amounted to less than the minimum wage.

241. Upon information and belief, Defendants knew that they were required to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action at least the Federal minimum wage for each hour worked during a workweek. As such, Defendants' failure to pay the Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action the minimum wage was willful within the meaning of 29 U.S.C. § 255.

242. As a consequence of Defendants' violation of their rights under the FLSA, Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez seek unpaid minimum wages, plus an equal amount in liquidated damages, and costs

and attorneys' fees, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and the members of the collective action.

243.    SECOND CLAIM FOR RELIEF

(NORTH CAROLINA WAGE AND HOUR ACT)

244.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

245.    Defendants failed to pay Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez at least the product of the promised wage and each hour or part of an hour that Plaintiffs worked for Defendants for each workweek, in violation of N.C. Gen. Stat. § 95-25.6.

246.    The violations of the NCWHA resulted, in part, from Defendants' failure to reimburse Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez during their first week of employment for expenses incurred primarily for the benefit of Defendants, including recruitment fees, their inbound subsistence costs, lodging expenses near the U.S. Consulate, visa fees and visa-related processing fees, issuance of Form I-94, and the full cost of travel from their homes to Defendants' jobsite. When these expenses are calculated as deductions from their first week's pay, as required by law, they cause those Plaintiffs' and the members of the collective action's first week's earnings to be less than the AEWR promised to them.

247.    The violations of the NCWHA also resulted from Defendants' failure during various weeks to compensate Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez at the AEWR for all hours worked when Defendants paid them at a piece rate.

248.	As a result of these actions, Defendants are in violation of Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez' rights under N.C. Gen. Stat. §§ 95-26.6. Those Plaintiffs have suffered damages in the form of unpaid wages and liquidated damages that may be recovered from Defendants, jointly and severally, under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a1).

<u>THIRD CLAIM FOR RELIEF</u>

(NORTH CAROLINA COMMON LAW OF CONTRACT)

249.	Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

250.	This claim is brought by Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron against the Valadez Defendants for damages resulting from the Valadez Defendants' breach of their employment contracts as embodied in the 2018 Blueberry Order.

251.	The terms and conditions of employment contained in 2018 Blueberry Order constituted the employment contracts between the Valadez Defendants and the H-2A workers, including Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron, the terms of which were supplied by federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

252.	The Valadez Defendants offered employment on the terms and conditions set out in the 2018 Application for Temporary Labor Certification and accompanying 2018 Blueberry Order.

253.	Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron accepted the Valadez Defendants' offer.

48

254.   The Valadez Defendants breached their employment contracts with Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron by providing terms and conditions of employment that were materially different from those in the 2018 Blueberry Order.

255.   The Valadez Defendants breached their employment contracts with Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron by charging a recruitment fee.

256.   The Valadez Defendants breached their employment contracts with Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron by failing to contractually forbid their agents from seeking or receiving payments or other compensation from prospective employees, including these Plaintiffs.

257.   The Valadez Defendants breached their employment contracts with Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez by failing to provide housing that complied with 20 C.F.R. § 655.122(d) and the NCMHA.

258.   The Valadez Defendants breached their employment contract with Plaintiff Jimenez-Giron by failing to pay her the promised minimum hourly wage of $11.46 for each compensable hour of work in a workweek.

259.   The Valadez Defendants breached their employment contract with Plaintiff Jimenez-Giron by failing to pay her at least the applicable Federal minimum wage for each compensable hour of work in a workweek.

260.   The Valadez Defendants breached their employment contract with Plaintiff Jimenez-Giron by failing to timely provide reimbursement for her inbound transportation expenses.

261. The Valadez Defendants breached their employment contract with Plaintiff Jimenez-Giron by failing to accurately record her hours worked.

262. The Valadez Defendants' breach of their employment contracts with Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron caused substantial injuries.

263. The Valadez Defendants are liable to Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron for the damages that arose naturally and according to the usual course of things from Defendants' breach, as provided by federal common law and/or North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

264. Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez also bring this claim for damages resulting from the Valadez Defendants' breach of the employment contracts as embodied in the 2018 Varied Crop Order.

265. The terms and conditions of employment contained in 2018 Varied Crop Order constituted the employment contracts between the Valadez Defendants and the H-2A workers, including Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez, the terms of which were supplied by federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

266. The Valadez Defendants offered employment on the terms and conditions set out in the 2018 Application for Temporary Labor Certification and accompanying 2018 Varied Crop Order.

267. Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez accepted the Valadez Defendants' offer.

268.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by providing terms and conditions of employment that were materially different from those in the 2018 Varied Crop Order.

269.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by charging a recruitment fee.

270.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to contractually forbid their agents from seeking or receiving payments or other compensation from prospective employees, including these Plaintiffs.

271.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to provide housing that complied with 20 C.F.R. § 655.122(d) and the NCMHA.

272.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to pay them the promised minimum hourly wage of $11.46 for each compensable hour of work in a workweek.

273.   The Valadez Defendants breached their employment contracts with Plaintiff Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to pay them at least the applicable Federal minimum wage for each compensable hour of work in a workweek.

274.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to timely provide reimbursement for their inbound transportation expenses.

275.   The Valadez Defendants breached their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez by failing to accurately record their hours worked.

276.   The Valadez Defendants' breach of their employment contracts with Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez caused substantial injuries.

277.   The Valadez Defendants are liable to Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez for the damages that arose naturally and according to the usual course of things from the Valadez Defendants' breach, as provided by federal common law and/or North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

## FOURTH CLAIM FOR RELIEF

## (TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT - FORCED LABOR)

278.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

279.   This civil claim is brought by Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595 against the Valadez Defendants for violations of 18 U.S.C. § 1589(a).

280. 18 U.S.C. § 1589(a) provides that it is unlawful to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means— (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

281. In 2018, the Valadez Defendants, directly and vicariously through the acts of their agents and employees, knowingly attempted to and did threaten Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez with serious harm, including financial, reputational, and legal harm, in order to obtain the labor and services of these Plaintiffs in violation of 18 U.S.C. § 1589(a)(2).

282. In 2018, the Valadez Defendants, directly and vicariously through the acts of their agents and employees, knowingly attempted to and did threaten Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez with the abuse of law or legal process, including threatening Plaintiffs with termination of their visas, deportation, and reporting Plaintiffs to Immigration and other federal U.S. government officials, in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(a)(3).

283. This civil claim is also brought by Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Sleepy Creek Defendants for violations of 18 U.S.C. § 1589(b).

284.    18 U.S.C. § 1589(b) provides that it is unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

285.    Further, an individual who is a victim of forced labor as described in 18 U.S.C. § 1589(a) "may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in forced labor]" 18 U.S.C. § 1595(a).

286.    In 2018, the Sleepy Creek Defendants knowingly financially benefitted from participation in a venture which they knew or should have known engaged in forced labor of Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez as described in Paragraphs 277 through 280.

287.    The Sleepy Creek Defendants financially benefitted from participating in the venture specified in Paragraphs 277 through 280 by increasing their harvest and profits due to obtaining forced labor from Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez.

288.    For these violations, Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez have suffered injury and are entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

<u>FIFTH CLAIM FOR RELIEF</u>

(TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT – TRAFFICKING)

289.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

290.   This civil claim is brought by all Plaintiffs pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a), against the Valadez Defendants for violations of 18 U.S.C. § 1590.

291.   18 U.S.C. § 1590 provides that it is unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violations of laws prohibiting peonage, slavery, involuntary servitude, and forced labor" within the meaning of the provisions of the Trafficking Victims Protection Reauthorization Act.

292.   The Valadez Defendants, by and through their agents, knowingly recruited, provided, or obtained the labor of Plaintiffs by various fraudulent and/or coercive means including:

   a.   Knowingly making false representations on the 2018 Blueberry Application and accompanying 2018 Blueberry Clearance Order submitted to USDOL for approval;

   b.   Knowingly making false representations on the 2018 Varied Crop Application and accompanying 2018 Varied Crop Clearance Order submitted to USDOL for approval;

   c.   Making fraudulent promises to Plaintiffs regarding the terms of their living and/or working conditions with them in the U.S.;

   d.   Making fraudulent promises to Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez regarding the length of their visa to work with them in the U.S.;

   e.   Designing to ensnare Plaintiffs in debt in reliance on their promises of opportunity in furtherance of their trafficking scheme, whereupon the Valadez Defendants used this

55

debt and threats towards Plaintiffs and the other workers in a campaign of fear as a means of imprisoning Plaintiffs;

f.  Trapping Plaintiffs in debt and allowing no alternative means to pay their debt other than continuing to work for the Valadez Defendants;

g.  Forcing Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez to perform farm labor to work off their debt; and

h.  Threatening Plaintiffs verbally, directly and indirectly, through their threatened acts of harm towards other workers in view of Plaintiffs.

293.  The Valadez Defendants intended to benefit from their trafficking scheme.

294.  Through these activities, the Valadez Defendants knowingly recruited, transported, and harbored Plaintiffs so as to obtain their labor or services by:

a.  means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

b.  means of serious harm or threats of serious harm to that person or another person;

c.  means of the abuse or threatened abuse of law or legal process; or

d.  means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

295.  For these violations, Plaintiffs have suffered injury and are entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## SIXTH CLAIM FOR RELIEF

## (UNFAIR AND DECEPTIVE PRACTICES ACT)

296.   Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

297.   This civil claim is brought by Plaintiffs pursuant to the North Carolina Unfair and Deceptive Practices Act (UDTPA), against the Valadez Defendants for violations of N.C. Gen. Stat. § 75-1.1, *et seq*.

298.   The Valadez Defendants breached their contracts with Plaintiffs in a manner that included substantial aggravating circumstances and acts of deception, including misrepresenting the amount of work available, the wage rate to be paid, the fact of reimbursement for Plaintiffs' travel, visa, and border crossing costs, and the condition of housing for Plaintiffs, which caused substantial injury to Plaintiffs.

299.   The Valadez Defendants' policy or practice of unlawfully charging recruitment fees while signing written assurances that no such fees would be charged was an unfair act or practice within the meaning of the UDTPA. It was immoral, unethical, oppressive, deceptive, and offensive to public policy.

300.   The Valadez Defendants' policy or practice of overstating the length of the H-2A visa to be provided to Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez was an unfair act or practice within the meaning of the UDTPA.  It was immoral, unethical, oppressive, deceptive, and offensive to public policy.

301.   The foregoing conduct constitutes an activity "in or affecting commerce" within the meaning of the UDTPA.

302. As a result of the reliance of Plaintiffs on the Valadez Defendants' misrepresentations, unlawful acts, deceptive promises and unfair marketing and promises of payment, Plaintiffs suffered damages, including emotional distress and unpaid wages.

303. Plaintiffs are entitled to recover all damages resulting from the Valadez Defendants' unfair and deceptive conduct, as well as treble damages under N.C. Gen. Stat. § 75-16.

304. The foregoing conduct in violation of N.C. Gen. Stat. § 75-1.1 was willful, warranting an award of reasonable attorneys' fees to Plaintiffs. N.C. Gen. Stat. § 75-16.1.

<u>SEVENTH CLAIM FOR RELIEF</u>

(FRAUDULENT INDUCEMENT)

305. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

306. This claim is brought by all Plaintiffs against the Valadez Defendants and arises under the common law of torts.

307. The Valadez Defendants, personally and through their agents, knowingly included false misrepresentations in their 2018 Blueberry Order and the 2018 Varied Crop Order. These false misrepresentations included, among other things:

    a. that Plaintiffs would be paid $11.46 per hour for all of their hours of work each work week;

    b. that the Valadez Defendants would provide housing that complied with local, state, and federal health and safety standards; and

    c. that the Valadez Defendants would pay and/or reimburse Plaintiffs' visa, transportation, border crossing, and subsistence expenses.

58

308. These representations were false and were known by the Valadez Defendants to be false at the time that the Plaintiffs were recruited by the Valadez Defendants.

309. The Valadez Defendants made these false misrepresentations reasonably calculating to deceive Plaintiffs.

310. The Valadez Defendants made these false misrepresentations intending that the Plaintiffs rely upon them in order to induce the Plaintiffs to pay the recruitment fees that they demanded and to front significant visa and travel-related costs to travel from their hometowns to North Carolina to work for Defendants.

311. The false misrepresentations were material.

312. In reliance upon the Valadez Defendants' false misrepresentations, all Plaintiffs paid large sums of money to the Valadez Defendants for their required fees, and, in order to pay these fees, nearly all Plaintiffs borrowed the money at steep rates of interest, and with some Plaintiffs having to mortgage their property or their family's property as security for the loans.

313. Plaintiffs were injured as a result of their reliance on the Valadez Defendants' false statements and misrepresentations, which caused them to pay large sums of money to the Valadez Defendants, leave their homes, families, and employment in Mexico and come to the U.S. where they were not given their promised wages and working and living conditions.

314. As a result of the Valadez Defendants' false misrepresentations, Plaintiffs suffered damages.

<u>EIGHTH CLAIM FOR RELIEF</u>

(NEGLIGENT MISREPRESENTATION)

315. Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

59

316. This claim is brought by all Plaintiffs against the Valadez Defendants and arises under the common law of torts.

317. The Valadez Defendants, personally and through their agents, made written and oral material misrepresentations to the Plaintiffs while recruiting them as H-2A workers for work with the Defendants in the U.S. These misrepresentations included, among other things:

    a.  that the Valadez Defendants would procure a visa for six (6) months of work for Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, and Hernandez-Martinez;

    b.  that Plaintiffs would be paid $11.46 per hour for all of their hours of work each workweek;

    c.  that the Valadez Defendants would provide housing that complied with local, state, and federal health and safety standards; and

    d.  that the Valadez Defendants would pay and/or reimburse Plaintiffs' visa, transportation, border crossing, and subsistence expenses.

318. The Valadez Defendants failed to exercise reasonable care in providing information to the Plaintiffs about the job that they knew may be material to the Plaintiffs' decision to incur significant expenses and travel to the U.S. to come work for them.

319. In reliance upon the Valadez Defendants' misrepresentations, all Plaintiffs paid large sums of money to the Valadez Defendants for their required fees, and, in order to pay these fees, nearly all Plaintiffs borrowed the money at steep rates of interest, and with some Plaintiffs having to mortgaging their property or their family's property as security for the loans.

320. Plaintiffs were injured as a result of their reliance on the Valadez Defendants' and their agents' false statements and misrepresentations, which caused them to pay large sums of money to the Valadez Defendants, leave their homes, families, and employment in Mexico and

come to the U.S. where they were not given their promised wages and working and living conditions.

321.    As a result of the Valadez Defendants' misrepresentations, Plaintiffs suffered damages.

JURY DEMAND

322.    Plaintiffs demand a trial by jury on all issues so triable.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter an order:

1.    Finding that this Court has jurisdiction over Plaintiffs' claims;

2.    Granting a jury trial on all issues so triable;

3.    Declaring that Defendants violated Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez's rights under the FLSA as set forth in the First Claim for Relief;

4.    Declaring that Defendants violated Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez's rights under the NCWHA as set forth in the Second Claim for Relief;

5.    Declaring that the Valadez Defendants violated Plaintiffs' rights under the common law of contracts as set forth in the Third Claim for Relief;

6.    Declaring that the Valadez Defendants and the Sleepy Creek Defendants violated Plaintiffs' rights under the TVPRA as set forth in the Fourth Claim for Relief;

7.    Pursuant to 29 U.S.C. § 216(b), certifying named Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez as the representatives of the FLSA collective action that is alleged in Paragraphs 231 through 233 above with respect to the First Claim for Relief;

61

8. Entering judgment awarding Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Jimenez-Giron, Lopez-Arcos, and Lopez-Lopez and members of the collective action their respective unpaid minimum wages and an equal amount in liquidated damages;

9. Entering judgment awarding each Plaintiff their respective unpaid promised wages and an equal amount in liquidated damages;

10. Entering judgment awarding Plaintiffs Casillas-Serrano, De la Rosa-Alvarado, Hernandez-Martinez, and Jimenez-Giron their actual damages for the Valadez Defendants' breach of their employment contracts, as embodied in the 2018 Blueberry Order and

11. Entering judgment awarding Plaintiffs Moshan-Martinez, Gomez-Gonzalez, Gomez-Santiz, Lopez-Arcos, and Lopez-Lopez their actual damages for the Valadez Defendants' breach of their employment contracts, as embodied in the 2018 Varied Crop Order;

12. Enter judgment awarding each Plaintiff their actual damages from the Valadez Defendants' unfair and deceptive conduct, as well as treble damages;

13. Entering judgment awarding each Plaintiff their actual damages resulting from the Valadez Defendants' fraud, as well as punitive damages;

14. Enter judgment awarding each Plaintiff their actual damages from the Valadez Defendants' negligent misrepresentations;

15. Awarding Plaintiffs' costs, pre- and post- judgment interest as allowable by law, and a reasonable attorneys' fee of this action pursuant to the FLSA, 29 U.S.C. § 216, the NCWHA, N.C. Gen. Stat.§ 95-25.22, the TVPRA, 18 U.S.C. § 1595(a), and the UDTPA, N.C. Gen. Stat. § 75-16.1.;

16. Enjoining Defendants from further violations of the law alleged herein; and

17. Awarding other such relief as the Court may deem just and proper.

This the 28th day of September, 2020.

Respectfully submitted,

/s/ Caitlin A. Ryland
Caitlin A. Ryland
N.C. State Bar No. 38472
Email: CaitlinR@legalaidnc.org

/s/ Aaron V. Jacobson
Aaron V. Jacobson
N.C. State Bar No. 44065
Email: AaronJ@legalaidnc.org

/s/ Benjamin L. Williams
Benjamin L. Williams
N.C. State Bar No. 53665
Email: BenjaminW@legalaidnc.org

Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Phone: (919) 856-2180

/s/ Clermont F. Ripley
Clermont F. Ripley
N.C. Bar No. 36761
Email: clermont@ncjustice.org

/s/ Carol L. Brooke
Carol L. Brooke
N.C. Bar No. 29126
Email: carol@ncjustice.org

North Carolina Justice Center
P.O. Box 28068
Raleigh, NC 27611
Phone: (919) 856-2570

Attorneys for Plaintiffs

63

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

_____

JOSE ROLANDO MOSHAN-MARTINEZ, et al.,　)
　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs　　　　　　　)
v.　　　　　　　　　　　　　　　　　　　)　　　　CASE NO: 5:20-cv-00205-FL
　　　　　　　　　　　　　　　　　　　　)
FRANCISCO VALADEZ, JR. LLC et al.　　　)
　　　　　　　　　　　　　　　　　　　　)　　　　CERTIFICATE OF SERVICE
　　　　　　　　Defendants.　　　　　　　)
_____　)

This is to certify that on September 28, 2020, I electronically filed Plaintiffs' FIRST AMENDED
COMPLAINT with the Clerk of Court using the CM/ECF system which will send notification of
such filing to the following:

F. Marshall Wall
mwall@cshlaw.com
Zachary Antsett
zanstett@cshlaw.com

Cranfill Sumner & Hartzog LLP
P.O. Box 27808
Raleigh, North Carolina 27611-7808

*Attorneys for Defendants Francisco Valadez, Jr. LLC and Francisco Valadez, Jr.*

Caitlin Murray Goforth
Caitlin.Goforth@jacksonlewis.com,
Ann Herlocker Smith
Ann.Smith@jacksonlewis.com

Jackson Lewis P.C.
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612

*Attorneys for Defendant Winzeler Farms*

Gordon C. Woodruff
gwoodruff@wrflaw.com

64

Woodruff & Fortner
P.O. Box 708
Smithfield, NC 27577

Henry C. Smith
smith@warrenkerr.com
Warren Kerr Walston Taylor & Smith, LLP
P.O. Box 1616
Goldsboro, NC 27533-1616

*Attorneys for Defendants Sleepy Creek Farms and Goldsboro Milling*

William Joseph Austin,Jr
jaustin@nowlaw.com
Benton G. Sawrey
bsawrey@narronwenzel.com

Narron Wenzel, P.A.
5400 Glenwood Ave., Suite 201
Raleigh, NC 27612

*Attorneys for Defendant Cottle Farms*

By: /s/ Caitlin A. Ryland
Caitlin A. Ryland
N.C. State Bar No. 38472
Email: CaitlinR@legalaidnc.org
Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Phone: (919) 856-2180

*Attorney for Plaintiffs*

65